## KNIGHTS OF THE KU KLUX KLAN, Inc., v. STRAYER et al.

District Court, W. D. Pennsylvania. April 13, 1928.

No. 1819.

Corporations ⊜49(2), 189(12)—Knights of the Ku Klux Klan held not under evidence, entitled to equitable relief as to use of name or accounting for property.

Knights of the Ku Klux Klan *held* not entitled to equitable relief by injunction, or other relief relative to right to exclusive use of name and accounting for ownership of property claimed to belong to the Klan, in view of evidence showing unlawful acts and conduct of Klan members.

In Equity. Suit by the Knights of the Ku Klux Klan, a corporation under the laws of the state of Georgia, against Rev. John F. Strayer and others. Bill dismissed.

W. F. Zumbrunn, John H. Connaughton, and Benjamin H. Sullivan, all of Washington, D. C., and M. J. Hosack, of Pittsburgh, Pa., for plaintiff.

Van A. Barrickman, of Pittsburgh, Pa., and Lewis C. Walkinshaw, of Greensburg, Pa., for defendants.

THOMSON, District Judge. The plaintiff corporation, the Knights of the Ku Klux Klan, has filed a bill in equity against the defendants, in which they ask certain equitable relief at the hands of the court. In substance, they ask that the court decree that the plaintiff corporation is entitled to the exclusive use of the name "Ku Klux Klan," the invisible Empire of the Knights of the Ku Klux Klan, and other designations by which it is known. They aver that the defendants are not members of plaintiff corporation, having been excluded or banished therefrom, and that defendants are unlawfully in possession of certain property, robes, and other regalia, which is the property of the plaintiff, and that they have illegally collected funds belonging to the plaintiff, and have misappropriated the same.

Plaintiff asks for a decree declaring the ownership of said property to be in the plaintiff, that defendants be required to account for the same, that the title be quieted as against the defendants, and that they and

all other persons be restrained from using the information reposing in them as former members of the plaintiff, or from making use of the knowledge which they, or any of them, have of the identity of plaintiff's membership; that they be restrained from using or exercising any information in their possession relative to the conduct of the plaintiff, its secret work, its membership, and its property; and that the plaintiff recover from the defendants, and other unknown confederates $100,000, and, in addition, be required to account for all property in their possession or under their control, and that they be enjoined from operating in any manner under the name of the Ku Klux Klan, or any similar or like name calculated to confuse the membership of the plaintiff organization.

Evidence has been offered by the plaintiff for the purpose of substantiating the averments of the bill. The defendants in their answer deny the averments of the bill, and offer evidence in contradiction thereof, alleging that they are members in good standing of the plaintiff corporation, and have not been guilty of any of the matters charged against them. Defendants in addition have answered, and offered proof to sustain their averments, that the plaintiff corporation has been and is guilty of gross violations of the law, to such an extent as to bar them from any relief in a court of equity.

Under the testimony of the defense, which comes from Klansmen themselves, the court has no difficulty in finding, and does now find:

That the plaintiff corporation obtained its charter for charitable, eleemosynary, patriotic, and other purposes, and, being so chartered, was granted by the state of Pennsylvania a right to do business within the commonwealth, presumably for the purposes set forth in its charter; that, acting under the guise of its chartered purposes, it acquired a membership in this state of from 240,000 to 300,000 persons; that in violation of its charter, and in violation of its own constitution, it has established and is maintaining a form of despotic rule, which is being operated in secret, under the direct sanction and authority of the plaintiff's chief officers; that, in violation of the rights and liberties of the people, it has set up tribunals not known to the law, before which citizens of the commonwealth, not members of the Klan, are brought, subjected to some form of trial, and, upon conviction, severe corporal punishments are imposed, painful, humiliating, and often brutal in their character, and in some instances destructive of life itself.

That, under the direct authorization of the principal officers of the Klan in the state, men are designated for punishment, and are punished and maltreated, without any legal charge being preferred against them, and without a hearing or trial, in open and flagrant violation of the Constitution and laws of the land; that the plaintiff organization, through its actual operations and teachings, has stirred up racial and religious prejudices, fomented disorder, and encouraged riots and unlawful assemblies, which have resulted in flagrant breaches of the peace, defiance of law, bloodshed, and loss of life; and that such unlawful assemblies and riots have, in many instances, been brought about for the avowed purpose on the part of the officers in control of increasing the membership of the organization.

That in the secret operation of the corporation's activities, and in hostility to the civil authorities, military organizations are established and maintained, with arms, regalia, and equipment, with officers of varying rank and military titles, these officers being bound to obey without question the commands of the superior officer in authority of the plaintiff corporation.

In addition to this, bands known as "Knight Riders," or the "black-robed gang," armed, equipped, and masked, are formed and operated here and there throughout the country, both organizations being used at times as instruments of terror, oppression, and violence, and being thus a continuing menace to the public peace and destructive of the public order. The evidence in this case established conclusively gross violations of the law committed by the plaintiff within the Western district of Pennsylvania.

On the 6th day of July, 1923, under the direct orders of Sam D. Rich, Grand Dragon of the state of Pennsylvania, a band of seven or more men were sent into Beaver county to punish a negro. Pursuant to this unlawful purpose, they stopped the victim on the tracks of a railroad, thrust revolvers against the body of the negro, bound and gagged him, and threw him face downward in an automobile, the occupants of the machine sitting with their feet upon him. They then took him to Patterson Heights, a suburb of Beaver Falls, and, although earnestly protesting his innocence, tied a rope around his neck and threw it over the limb of a tree and swung him from the ground. After being thus suspended for a time, they then let him down, obtained a confession through these circumstances of duress and punishment, and, after kicking him in the stomach and otherwise

abusing him, left him and returned to Pittsburgh.

On the 4th day of June, 1923, the said Sam D. Rich, Grand Dragon of the state, ordered the kidnapping of a little girl, three or four years of age, who was living with its grandparents on Negley avenue in the city of Pittsburgh. Not only did he order the kidnapping, but was present and took a leading part therein; seizing the child when in front of its home, put the child in an automobile, where it was transferred to parts unknown. The grandparents, from whom the kidnapping was effected, have never to this day learned of the whereabouts of the child, or whether or not she is alive or dead.

I also find as a fact that Hiram Wesley Evans was present and spoke to the assembled multitude at Carnegie immediately before the riot; that he and Rich were well aware the civil authorities of Carnegie had forbidden the parade through the borough; and that in defiance of this position, and in utter disregard of the consequences which might naturally follow, he gave the order to march, which resulted in the serious riot, in which men were beaten and severely injured, at least one other man was wounded by gun fire and another man was shot to death. Under these circumstances, he was directly responsible for the riot and bloodshed which ensued.

The evidence also disclosed that, in the state of Texas, men were brought before the Klan, tried and convicted, and in some instances were subjected to brutal beatings, and in others were condemned to death and burned at the stake.

In view of all the facts disclosed by the evidence, the plaintiff corporation, stigmatized as it is by its unlawful acts and conduct, could hardly hope for judicial assistance in a court of the United States, which is highly commissioned to extend to all litigants before it, without distinction of race, creed, color, or condition, those high guarantees of liberty and equality vouchsafed by the Constitution of the United States. A court whose duty it is to recognize and uphold religious freedom as the first fruits of our civilization, to secure to every accused the right to full knowledge of the accusation against him, and a fair and impartial trial of the issue before a jury of his peers; a court which fully recognizes that this is a government of law, and not of men, and that no man shall be deprived of his life, his liberty, or his property without due process of law.

This unlawful organization, so destructive of the rights and liberties of the people, has come in vain asking this court of equity for injunctive or other relief. They come with filthy hands and can get no assistance here. Plaintiff's prayers for relief are denied and the bill is dismissed, at the costs of the plaintiff.

And now, to wit, April 13, 1928, the foregoing action having come on for hearing on bill and answers and testimony taken, and after argument by counsel, on full consideration thereof, the prayers of plaintiff's bill are denied, and the bill is dismissed, at the plaintiff's costs.